COMMONWEALTH vs. ROBERT E. O'NEAL.

Suffolk.    February 3, 1975. — April 18, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Homicide.    Rape.    Constitutional Law,* Cruel and unusual punishment, Due process of law.

Evidence in a murder case warranted a finding that the murder was committed in the course of rape of the victim; and the instructions to the jury on that issue were correct. [442-443]

Where a defendant was convicted of murder committed in the course of rape of the victim, the mandatory death penalty imposed pursuant to G. L. c. 265, § 2, could not be invalidated as involving jury discretion under *Furman* v. *Georgia,* 408 U. S. 238 (1972) [443-445]; WILKINS, J., joined by HENNESSEY and KAPLAN, JJ., thought that the matter should be further considered [451-452].

This court, instead of dealing with the question whether the death penalty is a cruel and unusual punishment in violation of the Eighth Amendment to the Federal Constitution, held that the right to life is a fundamental constitutional right, that due process of law requires that the burden be on the State to demonstrate a compelling State interest served by the mandatory death penalty and absence of any less restrictive means of furthering such interest, and that specified time should be allowed for filing of briefs on such issue of due process [445-447]; WILKINS, J., joined by HENNESSEY and KAPLAN, JJ., concurring, but on belief that the case should be considered first under art. 26 of the Declaration of Rights of the Massachusetts Constitution and the Eighth Amendment to the Federal Constitution, before resort to less specific due process provisions [451-452]; HENNESSEY, J., concurring separately [452-453]; and REARDON, J., joined by QUIRICO and BRAUCHER, JJ.,

dissenting to the filing of briefs on such due process issue, being of the opinion that the issue whether the death penalty is violative of the Eighth Amendment was squarely presented and fully argued and should be decided on what was presently before the court [453-454].

INDICTMENTS found and returned in the Superior Court on June 14, 1972.

The cases were tried before *Dimond*, J.

*William P. Homans, Jr. (Herbert Jacobs* with him) for the defendant.

*Roger A. Emanuelson,* Assistant District Attorney, for the Commonwealth.

TAURO, C.J. The defendant appeals pursuant to G. L. c. 278, §§ 33A-33H, from his conviction of murder in the first degree. The jury found the defendant guilty of deliberately premeditated murder committed in the course of armed robbery and rape and the trial judge imposed the mandatory sentence of death. G. L. c. 265, § 2. The defendant's principal challenge here is not to his conviction, but rather to the statutorily mandated sentence of death. In this context, we address the constitutionality of a general statute requiring a death sentence for a murder committed during a rape. Consequently, our decision is limited to this issue and not to a discussion of standards applicable to particular sentences imposed by judges exercising their discretionary sentencing powers under other statutes. Before reaching that issue, however, we dispose of his preliminary attack on the verdict itself.

From the evidence, the jury could have found the following. The defendant came to the door of the apartment occupied by the victim and her son Earl. The victim answered the door and the defendant entered the apartment. He went into Earl's room holding a gun in one hand and the victim's wrist in the other. He told Earl not to move. Earl, who suffered from muscular dystrophy, was confined to his bed, unable to move or

call for help. The victim and the defendant went toward the rear of the apartment. After twenty minutes, the defendant returned alone to Earl's room, took money and other items, and stabbed Earl in the abdomen and neck. The defendant made statements about not wanting to leave anyone who could call the police.

Shortly thereafter, a nephew of the victim came to the apartment and found the victim on her bed, partially undressed, with tissues stuffed in her mouth. She was dead. Evidence of sperm was found in both her vaginal and rectal areas. Earl, seriously injured, was taken to the hospital.

The defendant surrendered to the police a few days after the homicide. He made voluntary statements admitting that he entered the apartment, but said he could not remember what happened. He admitted that he might have taken some money and stabbed a man lying in bed. The defendant agreed to be taken to the hospital where he was observed by Earl who positively identified the defendant as the man who stabbed him.

1. The defendant contends that there was insufficient evidence from which the jury could have found that the murder was committed in the course of rape. He also argues that the charge to the jury was incorrect and prejudicial in this regard. We disagree.

If, from the evidence, the jury could properly have found that the defendant killed the victim "either in reducing her to helplessness prior to forcible sexual intercourse . . . or in stilling her outcries during such intercourse," *Commonwealth* v. *Gricus*, 317 Mass. 403, 412 (1944), they would have been warranted in returning a verdict of murder committed in the course of rape. From the evidence, the jury could have inferred that the defendant stuffed the tissues in the victim's mouth to keep her quiet while he had intercourse with her against her will. Such an inference would be both "reasonable and possible." *Commonwealth* v. *Medeiros*, 354 Mass. 193, 197 (1968), cert. den. sub nom. *Bernier* v.

*Massachusetts*, 393 U. S. 1058 (1969). *Commonwealth* v. *Montecalvo, ante,* 46, 54 (1975). This is not a case, like *Commonwealth* v. *Costa,* 360 Mass. 177 (1971), where there was *no* evidence that the sexual abuse occurred before the homicide. Accordingly, there was no error in submitting this issue to the jury. Cf. *Commonwealth* v. *McGrath,* 358 Mass. 314, 318-319 (1970).

Additionally, the charge to the jury on this issue was correct. The judge charged the jury essentially in the language of the *Gricus* case,[1] and we believe the instructions provided adequate guidance.

2. The defendant forcefully argues that we should invalidate the death sentence here because it involves jury discretion and thus violates *Furman* v. *Georgia,* 408 U. S. 238 (1972). The defendant would have us treat this case in the same manner as *Commonwealth* v. *A Juvenile,* 364 Mass. 103 (1973). However, this is a very different case, and we do not believe the "discretion" analysis applies.

The primary focus of the defendant's attack is *Commonwealth* v. *Gardner,* 11 Gray 438 (1858), where Chief Justice Shaw explained the degrees of murder as being for the purpose of mitigation of punishment. The defendant reasons that the statute, G. L. c. 265, §§ 1 and 2 (in so far as the death penalty is involved), is therefore unconstitutional under *Furman,* as it allows the jury to have discretion in determining whether the death penalty shall be imposed. While this analysis appears plausible at first glance, there are serious problems connected with its use.

The only crime in Massachusetts carrying the death

---

[1] The charge was in pertinent part as follows: "If the killing was committed immediately after the intercourse in order to conceal the crime, that would justify a finding that the killing was committed in the commission of rape. And, similarly, if the killing was committed to reduce the victim to helplessness for the purpose of forcible sexual intercourse against her will, that would justify a finding that the killing was committed in the commission of rape." The judge also charged the jury that "there is no crime of rape of a dead woman."

penalty is rape-murder. When, in a proper case, the jury have found as a fact that a murder was committed in the course of a rape or attempted rape, the death penalty is automatically imposed. The jury, if properly charged, have no discretion to find mitigating circumstances or a lesser degree of culpability (first degree versus second degree). The facts determine the outcome.

Of course, a jury *may* choose to disregard evidence that the murder was committed in the course of a rape in order to avoid imposition of a death penalty. Cases in which juries ignore proper judicial instructions are not unknown. Cf. *Commonwealth* v. *Mutina,* 366 Mass. 810, 818-821 (1975). Indeed, it is *possible* to argue from such cases that the process of jury fact-finding, in itself, introduces unconstitutional discretion to a murder trial which results in a death sentence.

Such an argument cannot be accepted. The essence of our system of criminal jurisprudence is trial by jury. In assigning the crucial fact-finding function to the jury, we assume that they will find the facts according to the evidence and apply the law to the facts in the light of the judge's charge. We assume, further, that the result of the jurors' deliberations will be a reliable one. If now we single out an occasional "rogue" jury or emphasize the mistakes which human fallibility occasionally causes jurors to make, we may discredit our entire criminal jury system. If the jury's "discretion" to find that a murder was committed in the course of rape is unconstitutional, why is their "discretion" to find the defendant guilty or not guilty of *any* crime itself not subject to the same infirmity?

This same argument applies to the other elements of discretion cited by the defendant.[2]     Currently plea

---

[2] As examples of the discretion inherent in the criminal process, the defendant points to the jury's ability to return verdicts of either murder in the first or second degree as well as to the effects of prosecutorial discretion, plea bargaining and executive clemency. See generally, Black, Capital Punishment: The Inevitability of Caprice

bargaining and prosecutorial discretion are necessary aspects of our criminal justice system and their legality should not be questioned in this regard. Furthermore, *Furman* can be read to apply only to *jury* discretion, thus making irrelevant the arguments as to the use of discretion in other areas.

Applying the defendant's "discretion" analysis to the instant case, it is difficult on this record to envision what more the judge could have done to protect the rights of the defendant. The judge charged the jury on all possible verdicts and then told them: "You, however, are not concerned with the disposition of the case. *Your responsibility is to bring in verdicts in accordance with the evidence and the law*" (emphasis added). The jury could not have received the impression (despite the defendant's statutory argument) that they were free to return whatever verdict they chose, regardless of the evidence, in order to assure or avoid imposition of a certain sentence.

If the charge raises *any* problem, it lies in the fact that the judge told the jury that only rape-murder carries the mandatory death sentence, but we believe the judge's cautionary language following this statement cured any possible defect in that regard.

For the foregoing reasons, we do not believe the "discretion" analysis is applicable to this case.

3. The defendant argues that the mandatory death penalty for rape-murder is unconstitutional as violative of the proscription of cruel and unusual punishment found in the Eighth Amendment to the United States Constitution. The defendant first argues that, although mandatory, the sentence is subject to discretion at many stages of the criminal proceedings, and thus falls within the express prohibitions of *Furman* v. *Georgia,* 408 U. S. 238 (1972). He argues alternatively that, even if not

and Mistake (1974). See also Comment, 54 B. U. L. Rev. 158, 173-182 (1974).

Commonwealth v. O'Neal.

discretionary, the death penalty itself is cruel and unusual and violates the Eighth Amendment.[3]

Both parties, in briefs and oral arguments, focus on whether the death penalty is violative of the Eighth Amendment. This question has long been the subject of considerable discussion and debate. In the recent past the debate has been greatly accelerated. Numerous volumes have been written on the subject, both for and against capital punishment. Illustrative of the breadth and depth of the work in this area are the various opinions of the Justices in the *Furman* case, as well as articles by former Associate Justice Arthur Goldberg. See Goldberg, The Death Penalty and the Supreme Court, 15 Ariz. L. Rev. 355 (1973). See also Goldberg & Dershowitz, Declaring the Death Penalty Unconstitutional, 83 Harv. L. Rev. 1773 (1970). Entire books have been published on this limited topic. See, e.g., Black, Capital Punishment: The Inevitability of Caprice and Mistake (1974). Moreover, a mere bibliography of the cases and articles dealing with this issue would probably exceed the length of this opinion. See, e.g., *People* v. *Anderson,* 6 Cal. 3d 628 (1972), cert. den. sub nom. *California* v. *Anderson,* 406 U. S. 958 (1972); Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Cal. L. Rev. 839 (1969); Gottlieb, Capital Punishment, 15 Crime and Deliquency 1 (1969); Rubin, The Supreme Court, Cruel and Unusual Punishment, and the Death Penalty, 15 Crime and Deliquency 121 (1969); Bedau, The Courts, the Constitution, and Capital Punishment, Utah L. Rev. 201 (1968); Note, The Death Penalty—The Alternatives Left After *Furman* v. *Georgia,* 37 Albany L. Rev. 344 (1973); Comment, The Death Penalty Cases, 56 Cal. L. Rev. 1268 (1968); Note, You May Kill, But You Must Promise Not to Use

---

[3] In attacking capital punishment under our State Constitution, the defendant argues that the death penalty is cruel *or* unusual. Art. 26 of the Declaration of Rights of the Massachusetts Constitution.

Discretion, 6 Loyola U. of Los Angeles L. Rev. 526 (1973); Comment, 6 Suffolk L. Rev. 1045 (1972).

We believe that we can add little to the extensive analytical and historical treatment this issue has received. We would bring no new perspectives not fully expounded elsewhere and, in deciding the case on this basis, we would simply enter the morass in which many others have floundered before us. In view of the rationale of this opinion, further debate and controversy on the applicability of the constitutional prohibition of cruel and unusual punishment will serve no useful purpose at this time.[4] We elect instead to adopt an approach free from the abundant commentary and exhaustive material surrounding the Eighth Amendment route.

4. It is generally well settled that State Legislatures are free to enact legislation as long as such legislation is not patently arbitrary or capricious. *Commonwealth* v. *Henry's Drywall Co. Inc.* 366 Mass. 539, 541-542, 543-544 (1974). Cf. *F. S. Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415 (1920). A statute duly enacted has presumptive validity and ordinarily will not be struck down if it "bears a reasonable relation to a permissible legislative objective." *Pinnick* v. *Cleary,* 360 Mass. 1, 14 (1971). In the ordinary case, such a statute will not be found to run afoul of the due process clause of the Fourteenth Amendment unless no state of facts may reasonably be conceived to justify it.[5] *Colella* v. *State*

---

[4] Chief Justice Burger in his dissenting opinion in *Furman* v. *Georgia, supra,* at 375-376, took the position that the language of the Eighth Amendment (cruel and unusual punishment) was uncertain and "less than self-defining" and that it was one of the most difficult "to translate into judicially manageable terms."

[5] Though we decide this case on the basis of principles and analysis derived from the due process clause of the Fourteenth Amendment to the United States Constitution, we believe that fundamental constitutional principles enshrined in our State Constitution dictate an identical result. See especially arts. 1, 10, 12 of the Declaration of Rights. "[T]he words 'the law of the land' in art. 12 which were

*Racing Commn.* 360 Mass. 152, 156 (1971). *Commonwealth* v. *Henry's Drywall Co. Inc., supra,* at 542.

Where fundamental constitutional rights are at stake, however, this general rule does not apply. In such a case the burden is reversed, *Selectmen of Framingham* v. *Civil Serv. Commn.* 366 Mass. 547, 555 (1974), and the State must demonstrate that the statute in question serves a compelling governmental interest. *Commonwealth* v. *Henry's Drywall Co. Inc., supra. Selectmen of Framingham* v. *Civil Serv. Commn., supra. Roe* v. *Wade,* 410 U. S. 113, 155 (1973). Cf. *Shapiro* v. *Thompson,* 394 U. S. 618, 634 (1969); *Dunn* v. *Blumstein,* 405 U. S. 330, 336 (1972). In addition, the State must also show the absence of less restrictive means to reach its compelling goal. *Roe* v. *Wade, supra.* Cf. *Aptheker* v. *Secretary of State,* 378 U. S. 500, 508 (1964); *Griswold* v. *Connecticut,* 381 U. S. 479, 485 (1965). Thus, if there is an alternative means by which the State can fulfil its purpose, having less adverse effects on fundamental constitutional rights, the State is required to use the less restrictive, more precisely adapted means. *Fiorentino* v. *Probate Court,* 365 Mass. 13, 19-20 (1974). "Statutes affecting constitutional rights must be drawn with 'precision,' *NAACP* v. *Button,* 371 U. S. 415, 438 (1963); *United States* v. *Robel,* 389 U. S. 258, 265 (1967), and must be 'tailored' to serve their legitimate objectives. *Shapiro* v. *Thompson* . . . [394 U. S.] at 631 [1969]." *Dunn* v. *Blumstein, supra,* at 343.

In the past, many rights guaranteed by the Constitution have been held to be fundamental, either in a due process or an equal protection context. These include freedom of speech and the press, *Lovell* v. *Griffin,* 303 U. S. 444, 450 (1938), *Schneider* v. *State,* 308 U. S. 147 (1939); freedom of religion and association, *Bates* v.

---

taken from Magna Charta embrace all that is comprehended in the words 'due process of law' in the Fourteenth Amendment." *Pugliese* v. *Commonwealth,* 335 Mass. 471, 475 (1957).

*Little Rock,* 361 U. S. 516, 524 (1960), *National Assn. for the Advancement of Colored People* v. *Button,* 371 U. S. 415 (1963), *Sherbert* v. *Verner,* 374 U. S. 398 (1963), *Williams* v. *Rhodes,* 393 U. S. 23, 31 (1968), *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 99 (1972); and the rights of privacy, *Griswold* v. *Connecticut,* 381 U. S. 479, 497 (1965) (Goldberg, J., concurring), *Roe* v. *Wade, supra*; procreation, *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535, 541 (1942); interstate travel, *Shapiro* v. *Thompson, supra, Memorial Hosp.* v. *Maricopa County,* 415 U. S. 250, 262 (1974); and voting, *Reynolds* v. *Sims,* 377 U. S. 533 (1964), *Kramer* v. *Union Free Sch. Dist. No. 15,* 395 U. S. 621 (1969), *Cipriano* v. *Houma,* 395 U. S. 701, 704 (1969), *Dunn* v. *Blumstein,* 405 U. S. 330 (1972). Although there is no precise standard for determining what rights are fundamental, we are guided by what is "explicitly or implicitly guaranteed by the Constitution." *San Antonio Independent Sch. Dist.* v. *Rodriguez,* 411 U. S. 1, 33-34 (1973).

We believe that the right to life is fundamental and, further, that this proposition is not open to serious debate. Cf. *Yick Wo* v. *Hopkins,* 118 U. S. 356, 370 (1886); *Johnson* v. *Zerbst,* 304 U. S. 458, 462 (1938). Aside from its prominent place in the due process clause itself, the right to life is the basis of all other rights and in the absence of life other rights do not exist. "Such a right to live . . . is the natural right of every man." Camus, Reflections on the Guillotine, in Resistance, Rebellion and Death 131, 221 (1969). It encompasses, in a sense, "the right to have rights," *Trop* v. *Dulles,* 356 U. S. 86, 102 (1958), and when it is taken, "[t]here is no redemption for the individual whom the law touches." *Skinner* v. *Oklahoma ex rel. Williamson, supra.* A denial of this fundamental concept would be tantamount to a denial of human existence. As such, we hold that life is a constitutionally protected fundamental right, the infringement upon which triggers strict scrutiny under the compelling State interest and least restrictive means

test. Thus, in order for the State to allow the taking of life by legislative mandate it must demonstrate that such action is the least restrictive means toward furtherance of a compelling governmental end.

Having determined that the statute requiring the imposition of the death penalty for rape-murder may be sustained against a due process challenge only if it subserves a compelling State interest and satisfies the least restrictive means test, we find it necessary to examine the interests advanced by the Commonwealth to justify the statute. The parties have not addressed themselves to this issue, however, and we should not make such an important determination without appropriate guidance. See *Pinnick* v. *Cleary*, 360 Mass. 1, 36-38 (1971) (Tauro, C.J., concurring). Accordingly, we allow the parties thirty days from the date of rescript for briefing (and allow thirty days for the filing of amici curiae briefs from responsible sources) on the narrow issue of whether the Commonwealth has a compelling interest which is served by imposition of the death penalty in rape-murder cases, and whether such penalty is the least restrictive means for furtherance of the Commonwealth's permissible objectives.[6]

*So ordered.*

---

[6] We recognize that a case by case exploration of the "compelling State reason" for taking of a life may lead to another dead end. This remains to be seen. In the meantime, it is an avenue of hope in judicial attempts to resolve a tremendously complex philosophical problem. After traveling this route, with the experience to be gained therefrom, perhaps the ultimate decision can be made whether the State can mandate, through its courts, the death sentence for *any* reason. Whether a civilized society has reached the stage in its development to make the right decision remains to be seen.

WILKINS, J., concurring (with whom Hennessey and Kaplan, JJ., join). I agree that there should be further briefing on the question of the extent of the Commonwealth's interest in the imposition of the death penalty in rape-murder cases. I believe, however, that the case should be considered first under the State and Federal constitutional provisions dealing directly with the subject (art. 26 of the Declaration of Rights of the Massachusetts Constitution and the Eighth Amendment to the Constitution of the United States) before resort is had to the less specific due process provisions of those Constitutions.

The Chief Justice's opinion refrains from predicting the United States Supreme Court's conclusion concerning the constitutionality under the Eighth Amendment of a mandatory death penalty ("cruel and unusual punishments") and does not discuss the defendant's challenge to the death penalty under art. 26 of the Declaration of Rights ("cruel or unusual punishments"). No doubt these questions will have to be considered by this court subsequently in this case.

Particular attention should be paid to art. 26. I attribute no special significance to the difference in its wording from that of the Eighth Amendment. However, I believe that art. 26 requires, at the very least, that the Commonwealth not take a person's life unless that action serves a substantial purpose which cannot otherwise be achieved.

Certainly at the time of its adoption, art. 26 was not intended to prohibit capital punishment. Capital punishment was common both before and after its adoption. However, art. 26, like the Eighth Amendment, "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958). In this respect the appropriate standards applicable in the Commonwealth may be higher under art. 26 than the standards applicable under the Eighth Amendment.

Contrary to the indication in the main opinion, we should also further consider whether the present Massachusetts statute concerning murder is unconstitutional, even as to a murder committed during a rape or attempted rape, because it may allow jury discretion which is impermissible within the holdings of *Furman* v. *Georgia,* 408 U. S. 238 (1972).   In my view, the statutory provision that "[t]he degree of murder shall be found by the jury" requires further serious consideration as to whether a jury may in its arbitrary discretion return a verdict of murder in the second degree.   G. L. c. 265, § 1.   See *Commonwealth* v. *Gardner,* 11 Gray 438 (1858); *Commonwealth* v. *Desmarteau,* 16 Gray 1 (1860); *Green* v. *Commonwealth,* 12 Allen 155 (1866); *Commonwealth* v. *Chase,* 350 Mass. 738 (1966).   If we reach that conclusion, we should then proceed to an examination of the statute in light of the *Furman* case.

I have joined in the result of the Chief Justice's opinion because, although it is based on a different constitutional premise, it calls for the presentation of subsequent arguments on issues which are similar to those I believe art. 26 raises.

HENNESSEY, J. (concurring).   I have joined Justices Kaplan and Wilkins in a concurring opinion which emphasizes, among other things, the importance of art. 26 of the Declaration of Rights of the Massachusetts Constitution.   See the similar emphasis by the Chief Justice in n. 5 of the main opinion.   I must add that I do not share the apparent reservations of Justices Kaplan and Wilkins about the pertinence of the Federal due process clause and the related compelling State interest test. Such a discussion would be relevant and useful, particularly because this line of reasoning apparently has not previously been explored.   As stated by Mr. Justice Harlan, "[T]he very breadth and generality of the [Fourteenth] Amendment's provisions suggest that its authors did not suppose that the Nation would always be limited

to mid-19th century conceptions of 'liberty' and 'due process of law' but that the increasing experience and evolving conscience of the American people would add new 'intermediate premises.'" *Duncan* v. *Louisiana,* 391 U. S. 145, 175 (1968) (Harlan, J., dissenting). This court must examine *all* relevant reasoning, including the argument that new standards of compassion have made the death penalty unconstitutional. *Furman* v. *Georgia,* 408 U. S. 238, 371 (1972) (Marshall, J., concurring).

REARDON, J., concurring in part and dissenting in part (with whom Quirico and Braucher, JJ., join). I am in agreement with those portions of the majority opinion which hold that there was sufficient evidence from which a jury could have found that the defendant committed murder in the first degree in connection with the commission of rape or an attempt to commit rape, and that the instructions to the jury on this issue were accurate and adequate for the reasons expressed in the opinion. I am also of the belief that the verdict should not be revised on the claim that the jury were cloaked with discretion to determine whether the death penalty should be imposed.

It is my belief, however, that the defendant's claim that the mandatory death penalty in this instance violates the Eighth Amendment to the United States Constitution in that it provides for the imposition of cruel and unusual punishment is squarely presented, was fully argued, both by the Commonwealth and the defendant, and, in my view, can be and ought to be decided by this court on what is now before us.

I, therefore, am not in accord with the decision of the majority to permit the parties and others to file further briefs "on the narrow issue of whether the Commonwealth has a compelling interest which is served by imposition of the death penalty in rape-murder cases, and whether such penalty is the least restrictive means for furtherance of the Commonwealth's permissible objectives."

In short, it appears to me that what is now before this court is ample to enable it to dispose of this matter without further inquiry. In view of the fact that, as now seems, further argument by brief or otherwise is to be entertained by this court on this issue, I reserve the right to state my views thereon at such time as the court renders its ultimate opinion.