OPINIONS OF THE JUSTICES TO THE HOUSE OF
REPRESENTATIVES.

*Homicide.    Constitutional Law,* Cruel and unusual punishment.    *Death
Penalty.*

Proposed legislation establishing a plan by which a trier, after convic-
tion of a defendant of murder in the first degree, would consider
certain aggravating and mitigating factors and decide whether the
sentence should be death or life imprisonment would violate art. 26
of the Massachusetts Declaration of Rights. [917] QUIRICO & BRAU-
CHER, JJ., dissenting.

On June 8, 1977, the Justices submitted the following
answers to a question propounded to them by the House
of Representatives.

To the Honorable the House of Representatives of the
Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court
respectfully submit their answer to the question stated
in an Order adopted by the House on February 1, 1977,
and transmitted to us on February 3, 1977.

The Order recites that there is pending before the Gen-
eral Court a bill, House No. 3373, entitled, "An Act to
provide for capital punishment," a copy of which was
transmitted to us with the Order. We are asked to express
our opinion whether the bill, if enacted, would violate arts.
1, 10, 12, or 26 of the Declaration of Rights of the Massa-
chusetts Constitution.[1]

*The bill.*    The general design of House No. 3373 is to
provide a dual procedure when a defendant is charged with
murder in the first degree. The first phase is to consist of
trial of the charge. If the trier finds the defendant guilty,
then there is a second, separate sentencing phase before
the same trier in which argument and evidence may be

---

[1] The Order and bill here considered are nearly identical to the
Order and bill transmitted to us last year. Because of the prorogation
of the Legislature, we were unable to respond to the earlier request.
See *Answer of the Justices,* 371 Mass. 902 (1976).

adduced relevant to certain factors or standards described in the bill intended to single out those offenders who merit capital punishment. The trier is to decide on the material thus brought forward whether sentence of death, rather than life imprisonment, is justified. When sentence of death is passed, there is review by the Supreme Judicial Court to guard further against arbitrary or capricious imposition of the death penalty.

To describe the four sections of the bill in greater detail: Section 1 would amend G. L. c. 263, § 6, to give a defendant charged with murder in the first degree the right (which he does not have at present) to waive trial by jury and accept trial by a judge alone. Section 2 would strike from G. L. c. 265, § 1, the last sentence which states: "The degree of murder shall be found by the jury." Section 3 would strike from G. L. c. 265, § 2, the present provisions regarding punishment on conviction of murder in the first degree,[2] and would substitute the following: "Whoever is guilty of murder in the first degree shall suffer the punishment of death, unless the jury in cases tried by a jury or the court in cases tried by the court, pursuant to the procedure set out in sections fifty-three through fifty-six of chapter two hundred seventy-nine, as amended, recommends that the sentences of death be not imposed, in which case he shall be punished by imprisonment in the state prison for life."

Section 4 would add to G. L. c. 279 the four new sections (§§ 53-56) referred to in the text just quoted, which describe the sentencing procedure. On the return of a verdict of a jury or a finding of a judge that the defendant was guilty of murder in the first degree, a presentencing hearing would be held before the same trier to determine

---

[2] The provisions now found in G. L. c. 265, § 2, as amended through St. 1956, c. 731, § 12, which would be struck are: "Whoever is guilty of murder in the first degree shall suffer the punishment of death, unless the jury shall by their verdict, and as a part thereof, upon and after consideration of all the evidence, recommend that the sentence of death be not imposed, in which case he shall be punished by imprisonment in the state prison for life. No such recommendation shall be made by a jury or recorded by the court if the murder was committed in connection with the commission of rape or an attempt to commit rape."

the punishment to be imposed. Argument on both sides and "all additional relevant evidence in extenuation, mitigation, and aggravation of punishment" would then be received (§ 53).[3] Included in the aggravating matter that might be entertained are eleven "statutory aggravating circumstances" pointing more particularly to the nature of the offense or the kind of victim or offender (§ 54 [a]). Illustrative are: "(1) The offense of murder was committed by a person in connection with the commission of rape or an attempt to commit rape on the victim"; "(2) The offense of murder was committed on the victim who was killed while serving in the performance of his duties as a police officer, firefighter or correctional officer"; "(5) The offense of murder was committed by a person who had previously been convicted of the crime of murder in the first degree." (The other statutory aggravating circumstances are reproduced in the margin.[4]) Mitigating

---

[3] This would include the record of any prior criminal convictions and pleas of guilty or nolo contendere or the absence thereof; but only such aggravating evidence would be admissible as the Commonwealth had made known to the defendant before trial.

[4] "(3) The offense of murder was committed on the victim during the commission of a breaking and entering into a dwelling.

"(4) The offense of murder was committed on the victim in the course of a kidnapping for ransom of the victim or attempted kidnapping for ransom of the victim.

. . . .

"(6) The offense of murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.

"(7) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value.

"(8) The offender caused or directed another to commit murder or committed murder as an agent or employee of another person.

"(9) The offense of murder was committed on the victim during the commission of an armed robbery.

"(10) The offender by his act of murder knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person.

"(11) The offense of murder was committed on the victim during the course of a hijacking or attempted hijacking of an airplane or school bus."

matter would include six "statutory mitigating circumstances" (§ 54 [b]), of which the following are illustrative: "(1) The offense of murder was committed by one with no history of prior serious criminal activity"; "(5) The offense of murder was committed by one whose capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or alcoholic or drug intoxication."[5]

The judge's charge to the jury in the sentencing phase must be in writing, and the jury's verdict (which must be unanimous) or the judge's finding (where a jury had been waived), if calling for sentence of death, must likewise be in writing. Such a verdict or finding, to be effective, must specify one or more aggravating circumstances, of which one, at least, must be a statutory aggravating circumstance (§ 54 [c]).

There would be an automatic review by the Supreme Judicial Court of any death sentence imposed (§ 55 [a]). Besides considering any errors of law claimed to have been committed in the sentencing proceeding, the court would consider the propriety or fairness of the punishment itself according to stated criteria,[6] referring in its decision to

---

[5] The other circumstances are:

"(2) The offense of murder was committed by one who was under the influence of extreme mental or emotional disturbance.

"(3) The offense of murder was committed by one who was a participant in the defendant's homicidal conduct or consented to the homicidal act [sic].

"(4) The offense of murder was committed by one under duress or under the domination of another person.

. . . .
"(6) The age or mental capacity of the defendant at the time of the crime."

[6] The court is to "determine" (§ 55 [c]):

"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

"(2) Whether the evidence supports the jury's or trials [sic] court's finding of a statutory aggravating circumstance as enumerated in subsection (a) of section 54, and

"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

"similar cases which it took into consideration" (§ 55 [e]).[7]
Possible results would include affirmance of the sentence
of death, reversal for imposition of a sentence of imprison-
ment for life, and (where error of law was found) remand
for retrial on the issue of punishment (§ 55 [e] [1], [2]).[8]

*The Order.* The Order to which we here respond states
that "[t]he United States Supreme Court has held that
capital punishment is not violative of the eighth amend-
ment of the Constitution of the United States provided
that such punishment is determined by a presentence
hearing similar to that set forth" in House No. 3373. Yet,
the Order states, the opinion of this court in *Common-
wealth* v. *O'Neal,* 367 Mass. 440 (1975) (*O'Neal I*), 369
Mass. 242 (1975) (*O'Neal II*), "indicated that Article 26
of the Massachusetts Declaration of Rights may be found
to be more restrictive than the eighth amendment to the
Constitution of the United States." The Order further
states that although the *O'Neal* decision involved only the
question of the punishment for rape-murder, the language
and reasoning of the court "could be construed as being
applicable to other murders." Consequently grave doubt
exists as to the constitutionality of House No. 3373 and
the opinion of the Justices is required on the question:

"Would the enactment of said House, No. 3373 which
provides for capital punishment for 'Whoever is guilty of
murder in the first degree, unless the jury — or the court'
after a presentence hearing recommends that the sentence
of death not be imposed be an unconstitutional violation
of Article 1, 10, 12 or Article 26 of the Massachusetts Dec-
laration of Rights:

"(a)  as to rape murder;

"(b)  as to other murders enumerated in subsection (a)
of section fifty-four of chapter two hundred and seventy-

---

[7] Records of sentences imposed in cases of murder in the first degree
would be accumulated, and the Executive Secretary to the Justices of
the Supreme Judicial Court would furnish information from these rec-
ords as requested by the court (§ 55 [f]).

[8] Any direct appeal from a verdict of guilty would be consolidated
with the review of sentence (§ 55 [g]).

nine of the General Laws, which would be inserted by said House, No. 3373?"

*Summary of answer.* Holding the same overriding view as was expressed by a majority of this court in *O'Neal II,* the undersigned Justices answer that art. 26 of the Declaration of Rights — "No magistrate or court of law, shall ... inflict cruel or unusual punishments"[9] — forbids the imposition of a death penalty in this Commonwealth in the absence of a showing on the part of the Commonwealth that the availability of that penalty contributes more to the achievement of a legitimate State purpose — for example, the purpose of deterring criminal conduct — than the availability in like cases of the penalty of life imprisonment. Existing studies of the entire subject have provided no such demonstration regarding any of the situations of murder that would be covered by the proposed legislation, nor has the Legislature made findings resulting from investigation that might furnish the demonstration. Accordingly, House No. 3373 would violate art. 26.

Certain of the Justices would question the constitutionality of the bill for other reasons as well.

*Discussion.* In *Furman* v. *Georgia,* 408 U.S. 238 (1972), the Supreme Court held that the Eighth Amendment (taken together with the Fourteenth) invalidated a sentence of death pronounced under a State statute which allowed the jury untrammeled discretion in choosing between death and life imprisonment as the penalty for the crime of murder. That decision had the effect of nullifying the provisions of G. L. c. 265, § 2, which (with an exception to be separately discussed) required that a defendant convicted of murder in the first degree should be executed unless the jury as part of its verdict of guilty recommended that the death penalty be not imposed. After *Furman,* a verdict of murder in the first degree in any case in which the jury previously had the recommending power

---

[9] The entire article reads: "No magistrate or court of law, shall demand excessive bail or sureties, impose excessive fines, or inflict cruel or unusual punishments."

has been held to require imposition of a sentence of life imprisonment, and not to permit imposition of a death penalty. See *Commonwealth* v. *Harrington*, 367 Mass. 13, 15-22 (1975).

But there was a provision of the same § 2 which was read to mean that murder committed in connection with rape or attempted rape carried a mandatory sentence of death. As no discretion was left to the jury in such a case to mitigate the punishment, the reasoning of the *Furman* decision did not apply to the situation. The relevant provision of the statute was nevertheless attacked on constitutional grounds in the *O'Neal* litigation. A majority of this court held it to be invalid, and while two of the Justices in the majority in *O'Neal II* rested on considerations of due process under arts. 1, 10, and 12 of the Declaration of Rights as an alternative to the cruel-or-unusual punishments provision of art. 26, the latter ground was adopted by all the Justices of the majority as sufficient in itself to command the result, and indeed spoke most directly to the constitutional question.

The reasoning under art. 26 was that deprivation of life is a dread, ultimate sanction — unique, standing apart from other exactions by the State.[10] Unless the State could demonstrate in reason that this extreme penalty performed some legitimate State function more effectively than life imprisonment, execution of a sentence of death constituted a pointless infliction of excessive punishment and hence was "cruel" or "unusual" within the meaning of art. 26. The opinions in *O'Neal II* canvassed each basis on which it could be claimed that capital punishment excelled over life imprisonment in the respect mentioned. The basis having most surface appeal was that a prospect of suffering death had stronger deterrent effect on potential murderers than a prospect of being sentenced to im-

---

[10] "[D]eath as a punishment is unique in its severity and irrevocability"; "different in kind from any other punishment imposed under our system of criminal justice." *Gregg* v. *Georgia*, 428 U.S. 153, 187, 188 (1976) (Stewart, J.).

prisonment for life. But a careful examination in *O'Neal II* of the serious studies of the entire subject, including the reports of two Massachusetts legislative commissions, disclosed that the deterrence basis, like the others that might be asserted, had not been established by satisfactory empirical proof or by acceptable a priori reasoning.[11]

Experience, local and distinctive to Massachusetts, serves further to put in question any practical justification for a rationale of deterrence. A person contemplating a homicidal act in Massachusetts, and weighing the chances of being actually executed for the crime, would learn that from 1951 (when juries were given discretion in most murder cases to recommend life imprisonment) to 1973 (after *Furman*) juries in fact recommended life imprisonment for 100 out of 132 convicted murderers;[12] that between 1947 and 1973 forty-three original death sentences were commuted or reduced by executive action;[13] and that — to put the matter perhaps most cogently — the last execution in the Commonwealth occurred on May 9, 1947.[14] (Those jurors who omitted the recommendation in the thirty-two cases might themselves have recognized that their gesture would not result in an actual killing by the State.)

*O'Neal II*, holding unconstitutional, as noted, a mandatory sentence of death for murder connected with rape,

---

[11] See the discussion of the various studies of "deterrence" in *O'Neal II*, 369 Mass. at 252-258 (Tauro, C.J., concurring). The reports of Massachusetts legislative commissions referred to are those of special commissions established by Res. 1967, c. 150 (interim report issued in October, 1968), and by Res. 1957, c. 141 (report issued as 1959 House Doc. No. 2575).

To be added to the studies examined in *O'Neal II* is the recent analysis by Zeisel, The Deterrent Effect of the Death Penalty: Facts v. Faiths, 1976 Sup. Ct. Rev. 317, which reaches a conclusion strongly supportive of the *O'Neal* result.

[12] See Cannon, First Degree Murder: The Post Conviction Experience in Massachusetts 9 (study for Dep't of Correction, 1974).

[13] *Id.* at 15.

[14] W.J. Bowers, Executions in America 283 (1974).

was decided by this court in December, 1975. In July, 1976, the United States Supreme Court handed down a series of cases indicating that a majority of that Court are prepared, as far as the Federal Constitution is concerned, to validate State statutes which channel or regulate discretion in sentencing, thus overcoming the bar of the *Furman* case.[15] The question what criteria will be accepted for the purpose remains to be fully worked out. House No. 3373 resembles the statute held generally valid as against Federal constitutional claims in *Gregg* v. *Georgia,* 428 U.S. 153 (1976). Whether the bill would be held to conform to the Constitution of the United States we need not consider, as that question is not put in the Order. Rather, the Order poses the question whether the bill would violate the Declaration of Rights of the Commonwealth.

We believe it would. The bill sets up a machinery and standards by means of which the trier would attempt to decide whether individual defendants guilty of murder in the first degree should or should not be sentenced to death. But this entire procedure appears directed — as was the statute in the *Gregg* case — to meeting the *Furman* objection; it does not meet the *O'Neal* objection, namely, that capital punishment is "cruel" or "unusual" in the absence of a demonstration of its peculiar efficacy in comparison with other punishment.

It was remarked in the course of discussion in *O'Neal II*

---

[15] *Gregg* v. *Georgia,* 428 U.S. 153 (1976). *Proffitt* v. *Florida,* 428 U.S. 242 (1976). *Jurek* v. *Texas,* 428 U.S. 262 (1976). *Woodson* v. *North Carolina,* 428 U.S. 280 (1976). *Roberts* v. *Louisiana,* 428 U.S. 325 (1976).

"In summary, the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." *Gregg* v. *Georgia,* 428 U.S. at 195 (Stewart, J.).

that whereas the required demonstration had not been made in the case of rape-murder, there might be other kinds of homicide as to which such a showing might be made. The list of "statutory aggravating circumstances" at § 54 (a) of House No. 3373, even if compiled with other purposes in mind, might conceivably comprise one or more situations amenable to the demonstration demanded by *O'Neal*. But as matters stand, this can rest only in vague speculation.[16] Whether support, in the sense of *O'Neal*, could be found for any one of the "circumstances" if, for example, a legislative commission were to undertake a study particularly addressed to it, we cannot undertake to guess.

The view expressed to this point is joined in by the Justices subscribing to this answer to the House. We add that individual Justices question the validity of House No. 3373 on additional grounds: (1) that capital punishment is in itself so brutal to the object and so dehumanizing of others that it constitutes "cruel" or "unusual" punishment within art. 26;[17] (2) that, in practice, the process culminating in a sentence of death under the bill would have elements of untrammeled discretion very likely to work in discriminatory fashion against racial minorities and the poor.[18]

Returning to the question stated in the Order, we answer each part "Yes, a violation of art. 26." It is thus unnecessary to answer whether the enactment of House No. 3373 would or would not violate arts. 1, 10, and 12.

The foregoing answer and opinion is submitted by the

---

[16] As to the fallibility of "common sense" notions that the threat of the death penalty would deter in particular homicidal situations, see Zeisel, *supra* note 11, at 338-340.

[17] The practical experience in Massachusetts with capital punishment over the past thirty years, noted above, suggests that when faced with assuming actual responsibility for imposing and executing the death penalty, private citizens and officials recoil from it, whatever they may say about it as an abstract proposition.

[18] See C.L. Black, Jr., Capital Punishment: The Inevitability of Caprice and Mistake 84-91 (1974).

Chief Justice and the Associate Justices subscribing hereto
on the eighth day of June, 1977.

EDWARD F. HENNESSEY
BENJAMIN KAPLAN
HERBERT P. WILKINS
PAUL J. LIACOS
RUTH I. ABRAMS

A majority of the Justices have expressed the opinion
that House No. 3373 would violate art. 26 of the Massa-
chusetts Declaration of Rights, forbidding "cruel or un-
usual" punishments. House No. 3373 resembles, they say,
the statute held valid against Federal constitutional claims
in *Gregg* v. *Georgia,* 428 U.S. 153 (1976). The Eighth
Amendment to the United States Constitution forbids
"cruel and unusual" punishments, but nothing is made to
turn on the difference between "or" and "and."

Substantially for the reasons stated in the dissenting
opinion of Justice Reardon in *Commonwealth* v. *O'Neal,*
369 Mass. 242, 294 (1975), we are of the opinion that "for
purposes of this analysis art. 26 of the Massachusetts
Declaration of Rights imposes a standard no more restric-
tive than that expressed in the prohibition of 'cruel and
unusual' punishment in the Eighth Amendment." See
*Commonwealth* v. *Tarver,* 369 Mass. 302, 322 (1975) (Qui-
rico, J., dissenting). In our view, therefore, the enactment
of House No. 3373 would not violate art. 26, and we would
answer both parts of the question, "No." In particular,
we would follow the view in which seven of the nine Jus-
tices of the Supreme Court of the United States concurred,
that the sentence of death for the crime of murder does
not of itself constitute "cruel and unusual" punishment.
*Gregg* v. *Georgia,* 428 U.S. 153, 168-187, 226-227 (1976).
*Proffitt* v. *Florida,* 428 U.S. 242, 247, 260-261 (1976). *Ju-
rek* v. *Texas,* 428 U.S. 262, 268, 278-279 (1976). *Roberts*
v. *Louisiana,* 428 U.S. 325, 331, 350-356, 363 (1976). Cf.
*Woodson* v. *North Carolina,* 428 U.S. 280 (1976).

That view is reinforced by references in arts. 1, 10, and

12 of our Declaration of Rights, as in the Fifth and Four-
teenth Amendments to the United States Constitution,
to the enjoyment and deprivation of "life" and to "capi-
tal" crimes. The death penalty has been authorized by
Congress and the great majority of the States ever since
the Union was first organized; since the decision in *Fur-
man* v. *Georgia*, 408 U.S. 238 (1972), Congress and thirty-
five State Legislatures have reenacted the death penalty
for one or more crimes. Moreover, three of the Justices
who held in the *O'Neal* case that art. 26 proscribed the
death penalty for rape-murder expressed the view that
some kinds of murder might constitutionally be made sub-
ject to the death penalty. *Commonwealth* v. *O'Neal*, 369
Mass. at 263 n.23 (opinion of Tauro, C.J.), at 274-275
(opinion of Hennessey, J.), at 277-278 (opinion of Wil-
kins, J.).

One of those Justices also expressed the view that, "if
the present will of the people of the Commonwealth is
that capital punishment should be permitted in some or
all cases of murder in the first degree, procedures for
amendment of the State Constitution which are relatively
speedy, but still require time for reasonable reflection, are
available to accomplish that end." 369 Mass. at 275 (opin-
ion of Hennessey, J.). With respect, we would suggest
that if the present will of the people is that capital pun-
ishment should *not* be permitted in some or all cases of
murder in the first degree, procedures for amendment of
the State Constitution which are relatively speedy, but
still require time for reasonable reflection, are available
to accomplish that end. Instead, the *O'Neal* decision and
the present advisory opinion have accomplished a judicial
amendment to our Constitution shifting to the people the
burden of taking the steps necessary to make it mean
what it has been understood to say at all times since 1780.

We do not join the debate on the question of compara-
tive deterrence as between the death penalty and life im-
prisonment except to agree that the results "simply have
been inconclusive." *Gregg* v. *Georgia*, 428 U.S. at 184-185.
The majority depart violently from our traditional scru-

tiny of legislative determinations regarding punishment. See *Commonwealth* v. *Jackson,* 369 Mass. 904, 918-920 (1976). They convert a disputed factual question, on which reasonable men differ, into an absolute bar to legislation, placing the burden of proof on the Legislature. The departure does a disservice to our high function under the Constitution. We have no special competence in assessing complex statistical arguments over incremental deterrence, and we should not make constitutional rights depend on shifting evaluations of empirical data. The responsibility for evaluating all such data rests with the Legislature and not with this court.

FRANCIS J. QUIRICO
ROBERT BRAUCHER