**Tommie SMITH, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 182S19.**

Supreme Court of Indiana.

July 24, 1984.

Rehearing Denied Sept. 12, 1984.

1108

Stephen P. Wolfe, Marion, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Tommie Smith was convicted of Conspiracy to Commit Murder, Ind. Code §§ 35–41–5–2 and 35–42–1–1(1) (Burns Repl.1979), and Murder, Ind. Code § 35–42–1–1 (Burns Repl.1979), at the conclusion of a jury trial in Marion Superior Court on June 29, 1981. The trial court sentenced Defendant Smith to fifty (50) years imprisonment for conspiracy and to death for murder. Smith now appeals his convictions and sentences. This is a companion case to *Resnover v. State*, (1984) Ind., 460 N.E.2d 922, *reh. denied*. Defendants Smith and Resnover were tried jointly and given the same penalty.

Many of the issues presented to us here were the same issues in the appeal presented by Resnover and have already been decided in that case. There are also several issues raised here that pertain only to Defendant Smith. The issues that are presented concern:

1. constitutionality of Indiana's death penalty statute, Ind. Code § 35–50–2–9;

2. questions concerning the jury selection;

3. denial of change of venue because of pre-trial publicity;

4. denial of investigators to aid in the defendant's defense;

5. ineffective representation and incompetency of counsel;

6. refusal by the trial court to sever the charges of the defendant and sever the defendant's trial from that of his co-defendant;

7. evidentiary rulings by the trial court;

8. evidence obtained by improper search and seizure;

9. refusal by the trial court to give instructions on lesser-included offenses;

10. permitting the jury to have instructions and exhibits in the jury room during deliberations;

11. the question of double jeopardy in the defendant's conviction of murder and conspiracy to commit murder;

12. prejudicial statements by the trial court; and,

13. sufficiency of the evidence.

The evidence most favorable to the State was presented in *Resnover, supra,* at 926–27, and we adopt that recitation and make it part of this opinion as follows:

The evidence adduced during trial showed that at approximately 3:00 a.m. on December 11, 1980, Indianapolis Police Sergeant Jack Ohrberg met Sergeant Lewis J. Christ to serve papers on certain individuals believed to be at 3544 North Oxford Street in Indianapolis. Sergeant Ohrberg and Christ subsequently were joined by other officers before arriving at the duplex residence at 3544 North Oxford at approximately 5:30 a.m. With Officers Schneider and Harvey standing watch in the rear, Ohrberg, Christ and Officers Ferguson and Foreman proceeded to the porch and front door. Foreman and Ferguson were in uniform. Ohrberg knocked loudly several times and identified himself as a police officer. He then went to 3546 North Oxford, the adjacent other half of the double

residence, and checked with Sandra Richardson to ascertain whether any persons were known to be inside the 3544 address. Richardson told Ohrberg that she had heard noise come from 3544. Ohrberg returned to 3544 and again pounded on the front door and announced himself as a police officer. Ohrberg then assumed a crouched position and started to use his right shoulder to batter the door which, after a few hits, began to open. Ohrberg continued to hit the door placing his body partially inside the door. Foreman was shining a flashlight over Ohrberg's head since it was dark inside the residence and Foreman wondered why the front door would not fully open. Looking inside the house, Foreman saw some furniture blocking the door. Sergeant Christ also saw the furniture. As Foreman looked inside, he suddenly saw a burst of muzzle flashes and heard two, possibly three, shots in quick succession. The simultaneous muzzle blasts came from two separate locations approximately eight to ten feet apart. Christ also heard shots emanate from inside the residence. Ohrberg said: "Oh, no, I've been shot" or "I've been hit" and then stepped back two steps, sank to his knees and collapsed on the porch. Taking cover, Christ saw a person with an "Afro" type hairstyle emerge from the dark doorway onto the porch and fire at least two additional shots into Sergeant Ohrberg. Shots also were being rapidly fired from within the residence. When Christ returned the gunfire, the man on the porch quickly retreated inside the building. Ferguson also saw the person stand over Ohrberg and fire his rifle into Ohrberg. Ferguson specifically testified that he could see the muzzle flash as the rifle was fired. Ferguson fired at the gunman and then ran around the corner of the house where gunfire continued to be directed at him. After more shooting, a man identifying himself as "Gregory" called from inside the house and said "Let's talk." "Gregory" stated that there was an injured man inside and offered to send out the two women occupants. Christ refused to accept the women

and ordered "Gregory" outside. "Gregory" then said that he would come out whereupon he stepped to the door, threw a weapon out into the front yard and walked onto the front porch with his hands raised. Christ identified this man as Appellant Gregory Resnover and identified an AR–15 rifle as similar to the weapon Appellant threw into the front yard. Ferguson also identified the man as Gregory Resnover. Earl Resnover subsequently followed Appellant out onto the front porch where he laid down an AR–15 rifle and a Smith and Wesson revolver. Two women lastly walked out of the house leaving wounded Tommy Smith alone in the building. Foreman testified that the four came out of the house approximately ten to fifteen minutes after the initial burst of gunfire.

Forensic pathologist Dr. James A. Benz performed an autopsy on the body of Jack Ohrberg. Benz testified that Ohrberg died as a result of multiple gunshot wounds. He specifically testified that one bullet perforated Ohrberg's abdominal wall and external iliac artery and completely severed his iliac vein. Another shot lodged in the soft tissues of Ohrberg's back after fracturing parts of two vertebrae. A third shot entered his left side, fractured his tenth rib and bruised his lung. There were 600 mililiters of blood in Ohrberg's abdominal cavity.

The weapons thrown into the front yard or left on the front porch were collected by Russell Bartholomew, a crime lab technician. Bartholomew testified that the weapon thrown down by Appellant was an AR–15 automatic rifle with live rounds. The weapons on the porch were another loaded AR–15 and a loaded .38 caliber Smith and Wesson revolver. Evidence technician Cosmos Raimondi recovered weapons, ammunition clips, bullets and shell fragments from inside the house after it was secured by police. Raimondi testified that he found:

—one AR–15 rifle without clip but with one live round chambered; the rifle clip was located nearby damaged but containing twenty-five live rounds;

—one .30 caliber Universal carbine with one round chambered and a clip containing twenty-five rounds;

—one rifle clip concealed in a bathroom light fixture;

—one Mauser 7.65 automatic pistol recovered from underneath the front room sofa with one round chambered and one five round clip;

—fifteen spent shell casings recovered from the front room and kitchen;

—twelve live Smith and Wesson rounds for a .38 caliber Special pistol;

—one .223 ammunition clip with twenty-five live bullets discovered hidden underneath the front sofa;

—another .223 ammunition clip with twenty-six live bullets;

—one ammunition pouch with seven live automatic bullets found underneath a cushion on the front sofa;

—fifteen Smith and Wesson Specials and one WW .38 Special found lying loose on a coffee table;

—one Memorex casette box with fifteen live .38 caliber bullets;

—one AR–15 clip with thirty live .223 caliber bullets discovered in the rear bedroom; and

—one black shaving case containing one knife, one empty Colt AR–15 clip, one . ammunition clip possibly for a M–1 carbine and two hearing protectors.

The AR–15 recovered from the front porch bore Appellant's fingerprints on the ammunition clip. Although this gun had fired eight of the recovered shell casings, it did not fire the bullet recovered from Ohrberg's body. The AR–15 found inside the house with its broken clip located nearby fired the bullet retrieved from Ohrberg's body. The broken clip appeared to have been dented by a bullet.

Crime lab technician Robert McCurdy testified that he performed atomic absorption tests on swabbings taken from the arms of Appellant and Tommy Smith. Appellant's right arm had significantly higher amounts of barium and antimony, components of modern ammunition primer, indicating his handling or firing of a gun. The

tests conducted on the swabbings taken from Appellant's left arm were inconclusive. McCurdy also recovered from Earl Resnover a billfold containing Sergeant Ohrberg's business card." Atomic absorption tests on swabbings taken from the arms of Tommie Smith also indicated his handling or firing of a gun.

### I

Defendant raises several issues attacking the constitutionality of Indiana's death penalty statute § 35–50–2–9, that were raised and disposed of by this Court in *Resnover v. State*, (1984) Ind., 460 N.E.2d 922. These issues include: whether this Court's rules and practice allow requisite meaningful appellate review of a death penalty; whether the possibility of freakish application of the death penalty in Indiana renders the punishment cruel and unusual; whether the degree of prosecutorial discretion to seek the death penalty is impermissible; whether the statute fails to provide requisite standards of proof and guidance to the finder of fact; and whether it is unconstitutional to make killing of a police officer while on duty a statutory aggravating circumstance. These issues were all disposed of by this Court in *Resnover, supra*, Issue I, at pp. 928–31. Those findings are dispositive of the same issues raised here by defendant Tommie Smith.

■ The defendant raises some other issues. First, he argues that the death penalty is violative of Article I, § 18, of the Indiana Constitution: "The penal code shall be founded on the principles of reformation, and not of vindictive justice." Punishment of death is not in conflict with this provision of the Indiana Constitution. *Williams v. State*, (1982) Ind., 430 N.E.2d 759, *appeal dismissed* 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47; *Hawkins v. State*, (1941) 219 Ind. 116, 37 N.E.2d 79; *Rice v. State*, (1855) 7 Ind. 332. In *Williams*, we noted that Article I, § 18, is "an admonition to the legislative branch of the state government and is addressed to the public policy which the legislature must follow in formulating the penal code." 430 N.E.2d at 766.

*See also Denson v. State*, (1975) 263 Ind. 315, 330 N.E.2d 734. The death penalty is not in violation of Article I, § 18.

■ The defendant next cites a Massachusetts opinion, *Commonwealth v. O'Neal*, (1975) 367 Mass. 440, 327 N.E.2d 662, claiming that the State must first show there is a legitimate and compelling State interest that is served by imposition of the death penalty and that this interest could not be served by less restrictive means. *Id.* at 450, 327 N.E.2d at 668. The defendant argues that the State cannot meet its burden of showing deterrence or retribution through use of the death penalty when there are less restrictive means available, such as incarceration. This will insure his isolation from the public and thus protect members of society from his violence. The State's position is well taken that the holding of *O'Neal* is based on the interpretation of the Massachusetts Constitution and does not affect our laws or constitution in any respect. In addition, the United States Supreme Court wrote that "[it could] not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved." *Gregg v. Georgia*, (1976) 428 U.S. 153, 175, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859, 876.

■ We have held that our death penalty statute and the review that automatically follows complies fully with the standards imposed by the United States Supreme Court. *Resnover v. State*, (1984) Ind., 460 N.E.2d 922; *Schiro v. State*, (1983) Ind., 451 N.E.2d 1047, *cert. denied*, — U.S. —, 104 S.Ct. 510, 78 L.Ed.2d 699; *Williams v. State*, (1982) Ind., 430 N.E.2d 759, *appeal dismissed* 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47; *Brewer v. State*, (1981) Ind., 417 N.E.2d 889, *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384. This Court meaningfully and systematically reviews each case in which capital punishment has been chosen, in light of other death penalty cases. *Judy v. State*, (1981) Ind., 416 N.E.2d 95. The defendant still argues that Ind. Code § 35–50–2–9 is un-

constitutional because it does not require or mandate proportionality review. The United States Supreme Court recently decided that the Eighth Amendment, applicable to the states through the Fourteenth Amendment, does not require a state appellate court "to compare the sentence in the case before it with the penalties imposed in similar cases if requested to do so by the prisoner." *Pulley v. Harris,* (1984) — U.S. ——, ——, 104 S.Ct. 871, 876, 79 L.Ed.2d 29, 36. In view of the effective review procedures followed by this Court, the claim of the death penalty's unconstitutionality is without merit.

## II

■ Defendant raises several questions regarding the selection of the jury. He contends it is impermissible to allow the same jury which convicted him to consider whether to recommend the death penalty. In *Gregg, supra,* the Supreme Court of the United States considered and approved a capital sentencing statute which, among other things, provided a separate sentencing hearing before the same jury in which evidence considered during the guilt phase could be considered during the sentencing phase. Under Georgia's statute this evidence is introduced automatically without need for formal resubmission of the evidence. *Gregg,* 428 U.S. at 164, 96 S.Ct. at 2921, 49 L.Ed.2d at 869. The Supreme Court held that it was desirable for the jury to have as much information before it as possible when it makes the sentencing decision. The trial court also expressed concern that capital punishment determinations should be based on individualized determination of the nature of the crime and the nature of the offender. This would permit, if not compel, the sentencing authority to have before it all the facts adduced at the trial of guilt. The jury then, to properly carry out its recommendation role, would have to have before it all the evidence from the guilt phase. This Court held in *Judy, supra, Dillon v. State,* (1983) Ind., 454 N.E.2d 845, *cert. denied,* (1984) — U.S. ——, 104 S.Ct. 1617, 80 L.Ed.2d 145, and *State v. McCormick,* (1979) 272

Ind. 272, 397 N.E.2d 276, that a jury which convicted a defendant of a capital crime is capable, without prejudice, to determine aggravating and mitigating circumstances so long as this does not require what amounts to another trial on different facts. There is no error in submitting the question of sentencing recommendations to the same jury that heard the guilt phase of the trial.

■ Defendant claims there was error in the *voir dire* of the jury because death qualifying questions were asked by the State for the purpose of rejecting prospective jurors who are not in favor of capital punishment. Defendant cites *Witherspoon v. Illinois,* (1968) 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. *Witherspoon* held that it was impermissible to exclude a juror for cause merely because he had a general disagreement with the death penalty as a policy, or for having scruples against it. *Witherspoon* also held, however, that jurors may be excused for cause who actually state that they would not even consider returning a verdict of death and could not do so under any circumstances. This Court has found that a juror's conscientious scruples against the death penalty, even the feeling that he would find it almost impossible to vote for death, were not sufficient reasons to exclude a juror for cause in *Monserrate v. State,* (1971) 256 Ind. 623, 271 N.E.2d 420, but we held the trial court may exclude a juror for cause whose true stand without equivocation and without self-contradiction is that he would not vote for death in any case. *Hoskins v. State,* (1982) Ind., 441 N.E.2d 419. *See also Adams v. Texas,* (1980) 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581; *Lockett v. Ohio,* (1978) 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973.

In *Daniels v. State,* (1983) Ind., 453 N.E.2d 160, *reh. denied,* this Court found the requirement is satisfied where the totality of the questioning shows that jurors excluded for cause were unequivocally opposed to the death penalty. The record shows that several jurors were questioned regarding their scruples and indicated they

would be unable to give the death penalty. Some of those mentioned by Defendant equivocated on their feelings but were later excused for other reasons not related to this issue. It does appear that three jurors were excused for this reason. An examination of the testimony of these jurors on *voir dire* shows that all three of them unequivocally stated that they could not, under any circumstances, vote for the death penalty. These jurors were examined by the prosecution, the court, and the defense, and left no doubt about their attitudes. There was no violation of Defendant's rights in excusing these jurors.

▮ Defendant moved to have each prospective juror questioned individually and kept sequestered during *voir dire.* He asserts error in the denial of that motion. There is no right, accorded to a defendant to have each juror separately sequestered and questioned outside the presence of the other jurors. In fact, our general procedure in the conduct of trials is to the contrary. The trial court has broad discretion in regulating the form and substance of *voir dire* and this discretion will not be reviewed absent a clear showing of abuse of discretion. *Fielden v. State,* (1982) Ind., 437 N.E.2d 986; *McCormick v. State,* (1982) Ind., 437 N.E.2d 993; *Hopkins v. State,* (1981) Ind., 429 N.E.2d 631. There is no showing by Appellant here that he was prejudiced in any way by the manner in which the jury was *voir dired.* The law was followed in every respect and *voir dire* was conducted in the usual manner accepted and used by all trial courts in Indiana. There is no showing that the trial court abused its discretion in denying Defendant a separate individual *voir dire* of each juror.

▮ Included in Defendant's complaints about the jury selection was one raised in his motion to correct errors which attacked the racial composition of the jury panel which he says included only people who were not black. The issue of the racial composition of a jury panel, when raised by a defendant, requires a demonstration of purposeful discrimination against that racial group. The burden of showing such purposeful discrimination is on the defendant. When there is a demonstrated under-representation of an identifiable group, it must be demonstrated that the particular class' under-representation was due to systematic exclusion of that group. *Tawney v. State,* (1982) Ind., 439 N.E.2d 582, *reh. denied; Taylor v. Louisiana,* (1975) 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690. Defendant did not demonstrate before the trial court nor does he show here that there was any systematic exclusion of any particular group. Defendant Smith further alleged that the Marion County Prosecutor was prone to seek the death penalty for black defendants more often than he did for white defendants. This again was not substantiated or demonstrated in any way, either before the trial court or here. Defendant again only makes some general statements which are not supported by any facts or by the record in this cause. He has shown no basis for reversal on this issue.

### III

▮ Defendant claims there was excessive prejudicial pretrial publicity in Marion and the surrounding counties and motions for change of venue were improperly denied or granted. Smith and co-defendant Resnover were originally granted a change of venue from Marion County and the cause was venued to Hendricks County. Later, on May 27, 1981, Smith and Resnover asked that the case be returned to Marion County. They claimed that their race and the demographic distribution of blacks in Marion County rendered Marion County more able to provide an impartial jury than did Hendricks County. Thus, all parties agreed to have the cause returned to Marion County with the proviso that Hendricks Circuit Judge Jeffrey Boles remain the trial judge and serve in that capacity in Marion County. This was done. The State's position is well taken that if it was error to transfer the case back to the county of origin, it was error invited by the defendant and as such is not reversible

error. *Lacy v. State*, (1982) Ind., 438 N.E.2d 968. Furthermore, as this Court held in *State ex rel. Gannon v. Porter Circuit Court*, (1959) 239 Ind. 637, 159 N.E.2d 713, the Constitution of Indiana, Art. I, § 13, guarantees an impartial jury and the trial court has authority to consider applications for successive changes of venue where the application alleges that the venue county could not provide an impartial jury. Defendant Smith further claims the trial court erred in not granting a change of venue beyond the surrounding counties of Marion since the adjacent surrounding counties are in the nature of the metropolitan area of Marion County in that their activities are closely allied and they receive the same news from newspapers, TV and radio as that received by the citizens of Marion County. Defendant contends that if there is a general prejudice in Marion County, the likelihood is that same prejudice will be visited on the adjacent counties because of this close relationship. Defendant does not show here, however, that the local prejudice in Marion or the surrounding counties was such that there was a corrupted trial atmosphere which entitled him to a change of venue. Defendant did not actually show in the trial court or here the exact nature of the alleged prejudicial or inflammatory publicity other than to indicate that there was a lot of publicity. The record shows that out of more than eighty prospective jurors there were only six that expressed an inability on their part to render an impartial verdict in favor of the defendant because of their prejudice. Those six prospective jurors were excused. Out of the more than eighty prospective jurors, forty-three mentioned that they knew of this case. As this Court stated in *Williams v. State*, (1979) 270 Ind. 426, 429, 386 N.E.2d 670, 672, *reh. denied:* "It is not a prerequisite to a fair trial that the jurors be totally ignorant of the facts involved. The standard to be applied is whether or not 'the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' [*Irvin v. Dowd,* (1961) 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751.]" In

*Drollinger v. State,* (1980) Ind., 408 N.E.2d 1228, 1235, we again stated: "[W]e cannot presume, merely from the *amount* of pretrial publicity the case generated, that the trial setting was inherently prejudicial, in the absence of evidence of a 'trial atmosphere ... utterly corrupted by press coverage.' *Murphy v. Florida,* (1975) 421 U.S. 794 [798], 95 S.Ct. 2031 [2035], 44 L.Ed.2d 589, 594." In this case, other than the six jurors excused, the jurors stated they could lay aside any impression or opinion and render a verdict based on the evidence presented in court regardless of any information they had received. Defendant does not show there was such a general atmosphere of prejudice throughout the community to overcome the presumption the jurors *voir dire* testimony was truthful and therefore their verdict be considered to be lacking in fairness and impartiality. *Irvin, supra; Drollinger, supra; Williams, supra.* There is no showing that any newspaper publicity during the month preceding Defendant's trial was anything more than a rendition of the general facts concerning the trial. There is, therefore, no showing or inference that the jurors were exposed to publicity of a prejudicial or inflammatory nature. We therefore find no error on this issue.

### IV

Defendant claims the trial court erred in denying his motions for appointment of experts and investigators to assist his defense. Defendant, however, does not refer us to anything in the record that indicates he ever filed a motion for such assistance. The only reference to be found in the entire transcript is an oral statement by counsel during a pretrial conference in which he indicated to the trial judge that he had witnesses to interview in several parts of the State and might require some assistance from investigators. The trial judge told him it could not give him a *carte blanche* order and that ended the matter. There is no motion filed requesting the assistance nor indicating that any assistance was needed. Since the issue was not,

therefore, raised in the trial court, it is not available on appeal. *Brown v. State,* (1981) Ind., 417 N.E.2d 333. It is Defendant's duty to provide a record for appeal to enable this Court to review the issue alleged. An error alleged but not shown by the record is not a proper subject for review. *Hedges v. State,* (1982) Ind., 443 N.E.2d 62; *Banks v. State,* (1980) 273 Ind. 99, 402 N.E.2d 1213; *Jaske v. State,* (1978) 269 Ind. 196, 379 N.E.2d 451. There is, therefore, nothing presented for us to review on this issue. *Alleyn v. State,* (1981) Ind., 427 N.E.2d 1095.

## V

■ Defendant further claims he had ineffective representation of counsel in that his trial attorney was incompetent in handling his case, and further, the trial court erred in denying his motion to dismiss his attorney. In the rather lengthy review Defendant gives us in his brief, it appears the problem primarily stems from Defendant's anxiety to impose himself in the management of his defense and his disappointment that counsel relied on his own professional ability and experience in presenting a defense for the defendant rather than doing everything Defendant requested counsel to do. In viewing all of the circumstances as we are want to do on such an issue, it appears that trial counsel was a very experienced criminal defense lawyer and that he gave a very able and professional defense to this defendant. The fact that Defendant was convicted does not necessarily give rise to an inference that there was incompetency of counsel in view of the fact that there was a very strong case against the defendant.

■ It is, of course, basic that there is a presumption that counsel is competent and strong and convincing evidence is required to rebut that presumption. *Howell v. State,* (1983) Ind., 453 N.E.2d 241; *Lindley v. State,* (1981) Ind., 426 N.E.2d 398; *Rinard v. State,* (1979) 271 Ind. 588, 394 N.E.2d 160. Our standard of review is that the representation of counsel must present to us what appears to be a farce and a mockery of justice shocking to the conscience of the reviewing court as modified by a requirement that counsel must meet a minimum level of professional representation. *Strickland v. Washington,* (1984) — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Dillon v. State,* (1983) Ind., 454 N.E.2d 845; *Hollon v. State,* (1980) 272 Ind. 439, 398 N.E.2d 1273.

■ Appellant cites many instances of alleged incompetency of counsel in which he disagreed with the strategy taken by counsel with reference to objection to questions or items of evidence or failing to object thereto. We, of course, do not second guess counsel in choice of strategy and find no grounds for reversal on such choice by counsel where it appears as it does here that counsel exercised professional judgment where there were no choices to be made even though Defendant tends to disagree with those choices and even though in retrospect one might speculate as to the wisdom of a different choice. It is still necessary to show what the attorney did or did not do that rendered his representation below the standard demanded of legal counsel in such a criminal case as this and we have no demonstration of the record by Defendant wherein he makes the claims against counsel except his bare statement that it is true. *Dillon, supra; Hollon, supra.*

■ One of Defendant's claims alleging incompetent representation was his allegation that his attorney was so busy with other cases he did not have sufficient time to give adequate representation to this defendant in this trial. It is true that Defendant's counsel did, on occasion, ask the court for additional continuances and indicate that he was so busy that he needed more time to prepare for trial. The record shows, however, that this attorney represented Defendant in company with other co-counsel who had since withdrawn for a period of at least six months and that the court gave ample time to all parties to have discovery and prepare for trial. The fact that a party's attorney is very busy in other criminal cases and requests continu-

ances of the court for more time, does not necessarily result in the conclusion that there was inadequate time or consideration given to this case. We certainly can recognize that all trial attorneys are busy with other causes in addition to the one they are immediately trying and will, from time to time, request more time from the court. It is for the benefit of defendant as well as the State, however, to keep a trial moving in a reasonable fashion and the trial court has that responsibility. The record shows here that this trial court did give ample time to all parties to prepare for trial and that Defendant's counsel was, in fact, well prepared and well tried this cause.

 One of the major complaints Defendant makes about trial counsel is the disagreement between them as to selection of defenses. Defendant still insists he wanted his counsel to change his plea from not guilty to a plea of self-defense. This, of course, would not be a change of plea. Counsel had difficulty in having Defendant understand that self-defense was an inherent defense in a not guilty plea and it did not require a change of plea. The defense still attempted to show that Smith and Resnover did not know there were police officers at their door and the door was kicked in without any warning so that they were attempting to defend themselves when they fired their weapons. This defense, of course, was not convincing against the overwhelming evidence that the police had loudly announced their presence and the defendants were heard to say, inside of the apartment before the shooting started, that the police were out there. There was also direct testimony that when Sgt. Ohrberg attempted to open the door there was furniture pushed against it to prevent entry and that firing from at least two different points started immediately upon the attempt to enter. A witness in the apartment next to Defendants' heard them scurrying about the apartment and heard them state that the police were outside. This was before the shooting started. Defendant shows no incompetence on the part of counsel in the handling of this issue.

 Defendant further insisted he wanted to present to the jury that the presence of the rifles and pistols was for the purpose of hunting. Defendant had witnesses available, consisting of friends and associates, who allegedly would testify he was a hunting enthusiast and that they were intending to go on a hunting trip the next morning, hence the presence of the automatic weapons. Counsel candidly stated he refused to attempt to make such a defense as he thought it would be totally ineffective and work against Defendant's interest with the jury. This was a strategy choice by counsel that we would not question unless it showed a meritorious defense that counsel simply refused to put forward from negligence or lack of concern. That cannot be said of counsel's choice here. Although it was a choice of strategy and does not require our comment, we nonetheless note that nowhere do we have any reference to hunting other than Defendant's self-serving statement to that effect and apparently some statements of friends that he was a hunting enthusiast. He does not demonstrate in any way any plans of a particular hunting trip other than to generally say they had planned to go hunting the next morning. He makes no reference whatever to a particular location or type of hunting that would be consistent with possession of AR–15 automatic rifles and pistols. We can take judicial note of the fact that there is no hunting in the State of Indiana that permits the use of such weapons. There is no showing of ineffective representation on this issue. *Kimble v. State*, (1983) Ind., 451 N.E.2d 302.

 Defendant also had witnesses he requested brought to his defense who apparently would testify they witnessed Sgt. Ohrberg attempt to kick down doors before he announced that he was present and requested to be admitted. It was counsel's consideration that this would be a choice of strategy that would work against the interest of Defendant rather than to his benefit. In the first place, counsel had serious question whether such testimony would be ad-

missible in view of the strong direct evidence that Sgt. Ohrberg and other police here did announce their presence and that their presence was acknowledged by the defendants inside the apartment before entry was attempted. Furthermore, these witnesses coming on the stand would reveal themselves as friends and associates of Defendant and would also reveal the fact that they had many times themselves been involved in criminal activities. Counsel therefore determined the wisest choice was to refrain from attempting to present this defense. We again can see no showing of incompetence on the part of counsel in making such a decision. *Nelson v. State*, (1980) 272 Ind. 692, 401 N.E.2d 666.

Defendant attempted several times to file motions *pro se*, raising questions that he insisted be raised when counsel refused to do so. The court finally advised Defendant he was not permitted to file motions on his own but should file them through his attorney. Many of these motions were on issues we have already discussed here and all of them were based on the fact that he adamantly insisted on certain matters being raised even though counsel advised him it would be to his detriment to do so. Because of some of these conflicts, Defendant at various times moved to dismiss his attorney and obtain a better one. The court told him he saw no reason to remove the attorney and that if Defendant wished to hire other counsel on his own he was free to do so. Defendant never asked to proceed *pro se* and never offered to bring in another attorney. He stated he could not afford to hire another attorney but felt he wanted one who would do his bidding. At one point, counsel offered to withdraw if the court would permit him to do so and expressed to the court that he was making such an offer to give Defendant every opportunity to receive the best possible defense. Counsel advised the court that there was no serious conflict between himself and Defendant personally but that there were choices of strategy in which they differed. The trial court stated he saw no reason to remove counsel and made a finding that counsel was doing a sound and professional job in defending Defendant.

■■■■■■ Defendant also claims incompetency because there were two showings of conflict of interest that prevented counsel from effectively representing him. In order to establish a conflict of interest such that ineffective representation of counsel resulted, a defendant must show that his counsel "actively represented conflicting interests" and establish that this adversely affected his lawyer's performance. *Cuyler v. Sullivan*, (1980) 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333. One of the grounds of conflict of interest alleged by Defendant is the fact that his attorney, now a public defender, was formerly on the prosecuting attorney's staff and prosecuted criminal cases. He maintains this is a conflict of interest, *per se*, in that this attorney represented the police, including Sgt. Ohrberg, in cases in which police officers appeared as witnesses in criminal cases. There is, of course, no merit to this contention. The State is the client of a prosecutor. The prosecuting witnesses, including police officers, are not parties in a prosecution and no attorney-client relationship arises between a prosecutor and a police officer who may be a witness in a criminal trial.

■■■■■ The other allegation of conflict arises from counsel's private representation of one Duane Stewart. Stewart was not a witness in this case and had no knowledge of it. Defendant made an allegation of conflict of interest a day before the trial on the issue of Duane Stewart and the trial court had a hearing regarding this claim. Counsel had represented Stewart in a criminal case previous to this one and it appears that counsel had difficulty with Stewart in that trial. Stewart apparently told the jury in his trial that he was not being represented properly by counsel and further so behaved before the jury that he had to be bound and gagged in court. He and Smith apparently are alleging that while counsel was representing Defendant Smith, counsel came to Stewart and asked him if he, Stewart, had any information on

Tommie Smith and that if Stewart did have such information and told counsel about it, he could make a deal with the prosecution to cut Stewart's time in exchange for that information. Counsel denies that any such conversation ever took place. Stewart claims, however, that he never had any such information and never offered any to anyone, including counsel. The trial court found there was no showing of conflict of interest in this incident and we agree. It was within the province of the trial court to assess the credibility of this testimony and we will not disturb the trial court's finding in that regard. We see no showing of conflict of interest inasmuch as Stewart apparently had no relationship whatever to Defendant Smith, did not appear in any way in this cause of action, and had no effect or influence whatever on the trial. We see no merit to this contention.

Defendant alleges incompetence of counsel was shown by the fact that counsel presented no evidence during the death penalty phase of the proceedings. It is true a defendant is entitled to present a wide range of evidence in mitigation in a capital case. *Lockett v. Ohio*, (1978) 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973. The record is clear here, however, that Smith gave his counsel no assistance whatever in preparing a mitigation case and does not now claim there was anything in mitigation that could have been shown. In fact, Defendant refused to be present during the death penalty phase of his trial and insisted on being tried in absentia during this phase. We agree with the State's contention that the defendant should not now be entertained in his efforts to show a lack in his counsel when he himself totally refused to be involved in the process. The final claim of incompetency alleged by Defendant is that he had a right to dismiss his attorney on the day of trial and proceed *pro se*. It is not clear that Defendant moved for such a privilege and, in fact, equivocated on the question of whether he wanted to proceed *pro se* at that point. The trial court had a right to deny such a motion at that point anyway as it is untimely to present such a situation on the day of

trial and can properly be disposed of summarily by the court. *Dixon v. State*, (1982) Ind., 437 N.E.2d 1318. The record shows that the representation of counsel here was professional and more than adequate. Defendant was well prepared, well aware of all the facts of the case, acquired discovery, cross-examined witnesses, and vigorously tried the lawsuit. We see no reversible error on this issue.

## VI

Defendant claims the trial court erred by refusing to separate the charges and try him for murder before a different jury than that one trying him for conspiracy to commit murder and further for refusing to separate his trial from co-defendant Gregory Resnover. Defendant cites us to no authority on either of these propositions other than to state that he was prejudiced by having the same jury consider both charges and to consider his guilt along with that of Gregory Resnover.

Ind. Code § 35–3.1–1–9 (Burns 1979) [repealed effective September 1, 1982] provides in part that two or more offenses can be joined in the same indictment or information, with each offense stated in a separate count, when those offenses are "based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." § 35–3.1–1–11 (Burns 1979) [repealed effective September 1, 1982] provides:

"[T]he court, upon motion of the defendant or the prosecutor, shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense with a view to the number of offenses charged, the complexity of the evidence to be offered, and whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense."

The proper way to charge these two crimes then was to join them and try them togeth-

er. Defendant makes no showing that there would be a complexity of facts and circumstances that would confuse the jury and the two crimes certainly arise from the same set of facts and circumstances that justified the trial court in refusing to sever them. The same statutes authorize the charging and trying of defendants in the same trial where each of the defendants is charged as a conspirator or party to the commission of the offense such as in this case and where the offenses charged were part of a common scheme or plan or were so closely connected in respect to time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others. That certainly applies to this case again, since both Gregory Resnover and Tommie Smith were jointly charged with the murder and the conspiracy to murder Jack Ohrberg. Defendant Smith claims there was testimony given by witnesses that related only to admissions Gregory Resnover had made and that this, by association, prejudiced Smith. The record shows that the witnesses' testimony was directed toward Gregory Resnover only and did not involve Tommie Smith in any manner. The fact that the testimony of the witnesses tended to show the guilt of Gregory Resnover in the same trial did not demonstrate grounds for Defendant Smith to have a severance or to show undue prejudice toward his guilt. It was, therefore, proper for Defendant to be tried jointly with co-defendant Gregory Resnover and further to have presented to the same jury in the same trial both the charges of murder and conspiracy to commit murder.

## VII

Defendant claims there were a number of evidentiary rulings by the trial court that were in error. Defendant claims some evidence of a declaration of a co-conspirator because it was not preceded by independent evidence of a conspiracy. Although it is not clear as to what Defendant is referring, apparently it is the statement made by co-conspirator Gregory Resnover in the police car to the effect: "Beautiful shot. Blew him away." There also were statements made by Gregory Resnover to a fellow jail inmate and a newspaper reporter. The record shows, however, that before any of these statements were admitted into evidence, there was the testimony of Sandra Richardson, a neighbor, of having overheard a yell inside the apartment occupied by defendants that the police were outside and further evidence that as Ohrberg attempted to enter the duplex he was fired upon from two different points in the room. Muzzle blasts were seen by one of the officers with Ohrberg at two points in the room.

■■■■■ The State's contention is correct that there is at least circumstantial evidence of the existence of a conspiracy when two men who are aware that a policeman is entering the building suddenly and without warning open coordinated gunfire on the police officer. Conviction for a conspiracy may rest on circumstantial evidence alone. *Williams v. State,* (1980) Ind., 409 N.E.2d 571; *Howard v. State,* (1981) Ind. App., 422 N.E.2d 440. Smith is shown to be one of these persons firing as he was hit by Sgt. Ohrberg's return fire and was found in the location where one of the muzzle blasts originated. The AR-15 that fired at least one of the bullets found in Ohrberg's body was lying in the room near the location of Tommie Smith. We therefore see no merit to this contention.

■■■ Defendant claims that Sgt. Ohrberg's business card, which was found on one of the defendants and on which someone had written or printed the name of Ohrberg's wife and their address, should not have been admitted into evidence. Defendant cites no authority for his contention, so this issue could be considered waived pursuant to Appellate Rule 8.3(A)(7). However, we note the contention of the State, with which we agree, that the business card was relevant along with other evidence that showed defendants had encountered Jack Ohrberg before, that they knew him and knew he was investigating them for a possible connection with another offense. This would make the

card admissible because of its tendency to show that these defendants knew who Ohrberg was when he came to the door, and planned to shoot him, which was of probative value as to both the conspiracy and murder charges.

■ Defendant claims the trial court erred by allowing into evidence a tape recording of certain police radio communications relating to the instant murder. His complaint seems to be that the tape was garbled or unintelligible. The record does not bear him out on this. We decided this issue on the very same tapes in *Resnover*, 460 N.E.2d at 933 (Issue VI). We there found the tape to be admissible and see no point in repeating those findings here.

■ Defendant also complains of the admission of testimony of two persons who testified as to statements made to them by Gregory Resnover. One was a fellow jail inmate named Johnson and the other was a newspaper reporter named Scott Miley. His objection is based primarily on the fact that the testimony of these witnesses violated applicable law on the use of police agents to get admissions from persons in custody. We found in *Resnover*, 460 N.E.2d at 932 (Issues IV and V), that the testimony of these two witnesses was admissible since there was no showing that these witnesses were acting in any manner as agents of the police. Defendant Smith here directs us to nothing in the record that shows either of these witnesses were in any way connected with the police or that the police intentionally created a situation likely to induce Resnover to make incriminating statements in concert with the State. There was no *Miranda* violation in allowing police patrol driver Hunt to testify to Gregory Resnover's remark overheard on the intercom: "Beautiful shot. Blowed him away." The evidence was that neither prisoner in the van had been given any rights warning. The evidence also showed that no one questioned them nor had they been interrogated in any manner. The intercom was marked and not concealed and the purpose of the intercom was security and protection of the prisoners.

The requirements of *Miranda v. Arizona*, (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, do not apply outside the context of the inherently coercive custodial interrogation for which they were designed. Any statement made freely and voluntarily without any compelling influences is admissible in evidence. *Roberts v. United States*, (1980) 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622; *Rhode Island v. Innis*, (1980) 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297.

■ Defendant objects to the admission of test results of atomic absorption which are done for the purpose of determining the presence of the elements barium and antimony, ingredients present in modern ammunition primer formulations. Technician Robert McCurdy stated that tests can show whether an individual from whom the samples were taken had significantly higher than normal amounts of these elements, which would be consistent with handling or firing a firearm. It was McCurdy's testimony that if a subject had not recently handled or fired a weapon, his test results would have been much lower than those of defendant Smith's. His right hand had twenty-seven times more barium and almost fifty times more antimony than would be normal. The evidence was therefore admissible for use of the jury as it saw fit. Defendant gives us no authority whatever to reject this evidence and did not raise the issue in his motion to correct errors.

There is no showing of error in the admission of any of these items of evidence.

## VIII

■ After the incident involving the shoot-out between these defendants, their accomplices and the police resulting in the death of Sgt. Ohrberg and the arrest of these defendants, the police entered the apartment at 3544 North Oxford and obtained a substantial amount of physical evidence. Defendant moved to suppress this evidence claiming that it was obtained in violation of his right against unreasonable search and seizure. The trial court held a

hearing on this motion and denied it. The evidence before the trial court was that the duplex was rented by one Mary Nance. There was evidence that her daughter, Mary Rivers, intended it for her own apartment but could not have rented it in her own name because of a lack of acceptable credit. Neither of these people had yet occupied the premises, although there were some pieces of furniture and a television set in it. Mary Rivers was not at the apartment when the shooting occurred. Mary's sister, Theresa Nance, was in the apartment that night but had never been there before. Apparently Mary Rivers had visited the apartment on December 10, and Tommie Smith and others were there. There was no evidence nor does Tommie Smith claim that the premises searched were ever his residence. All that was indicated by the evidence was that Smith had done some work at the apartment earlier that day and had stayed there on a couch that night. Mary Rivers had not yet moved in and the next door neighbor had thought the place unoccupied although she did hear some noises. The trial court could therefore properly conclude that this was not Tommie Smith's residence nor was he in a position to have standing to object to a search of the premises as he could show no reasonable expectation of personal privacy there. There is therefore no showing of error on the part of the trial court in denying the motion to suppress and permitting the admission of the evidence. *Hope v. State,* (1982) Ind., 438 N.E.2d 273; *Lance v. State,* (1981) Ind., 425 N.E.2d 77; *Humes v. State,* (1981) Ind., 426 N.E.2d 379; *Murrell v. State,* (1981) Ind., 421 N.E.2d 638.

### IX

▮▮▮▮Defendant claims the trial court erred by failing to give final instructions on lesser included offenses of involuntary manslaughter or criminal recklessness. Defendant does not claim, however, that he ever offered such instructions or requested that they be given. He furthermore does not set out such instructions in his brief nor does he offer any authority or cogent argument on behalf of his contentions.

Defendant has therefore waived this issue and we will not consider it further. Ind.R. App.P. 8.3(A)(7).

### X

▮▮▮ Defendant further claims error in the trial court in its response to the jury's request to view certain exhibits and instructions after it had begun its deliberations. Defendant claims the trial court erred in overruling his objections to such a response. He cites us to no authority nor gives any cogent argument on this issue and we therefore deem it waived pursuant to Ind.R.App.P. 8.3(A)(7).

### XI

▮▮▮ Defendant claims it was a violation of his right against double jeopardy to have been tried, convicted and sentenced for murder and conspiracy to commit murder. He claims that conspiracy to commit murder and murder are identical and cites *Elmore v. State,* (1978) 269 Ind. 532, 382 N.E.2d 893. *Elmore* does not support his contention, however. In *Elmore,* we found that the defendant could be convicted for theft and conspiracy to commit theft, in that each charge requires proof that the other does not. This is consistent with the test for double jeopardy in *Blockburger v. United States,* (1932) 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306, and *Brown v. Ohio,* (1977) 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187. In applying the *Blockburger* test in *Elmore,* this Court found that the gist of a conspiracy is the agreement of two or more persons with the object of committing a felony without a requirement that the felony be committed or even attempted. The offense of theft, on the other hand, was the performance of the acts specified and the substantive statute prohibiting them requiring proof of the commission of those acts but not proof of any agreement with another person to commit them. Thus, each offense rested on facts which the other did not and both offenses could be charged and sentenced. *Elmore,* 269 Ind. at 540–542, 382 N.E.2d at 398.

*See also Williams v. State,* (1981) Ind., 426 N.E.2d 662, *reh. denied; Huff v. State,* (1983) Ind.App., 443 N.E.2d 1234; *Weekley v. State,* (1981) Ind.App., 415 N.E.2d 152. The same analysis obtains in this case. Murder requires proof of, among other things, a killing, but not necessarily of an agreement with another person to commit that killing. Conspiracy requires proof of an agreement but proof of the killing is not necessary. The two offenses are not identical and do not rest on the same facts. Therefore, it was proper for Defendant to be charged, convicted and sentenced on both offenses of murder and conspiracy to commit murder.

## XII

 Defendant claims the trial court made prejudicial and improper statements in the presence of the jury. The issue of the remarks of the trial court was not included in Defendant's Motion to Correct Errors and therefore could be considered waived pursuant to Ind.R.Tr.P. 59 and Ind.R.App.P. 8.3(A)(7). Furthermore, it does not appear Defendant objected to any of these remarks and therefore did not preserve any question on appeal. *Micks v. State,* (1967) 249 Ind. 278, 230 N.E.2d 298, *reh. denied; Biggerstaff v. State,* (1982) Ind.App., 435 N.E.2d 621. As the State points out, however, it appears that the jury was not present when the trial court made remarks deploring the attitude of the defendants following their decision to absent themselves from the courtroom during the presentation of evidence on the death sentence issue. The other incident was one wherein the trial court was explaining to prospective jurors before *voir dire* the consideration that must be made by them before a verdict recommending the death penalty could be made. Defendant claimed the statements by the court told the jury that under certain circumstances they must recommend the death penalty. In context, the court was telling the jury what they must do before they could return such a recommendation and not telling them they must make such a recommendation. He explained to the jury in great detail the find-

ings they must make before they are permitted to return the death penalty, that it must be a finding on their part beyond a reasonable doubt and that they must agree unanimously. The trial court did not commit any error on this issue.

## XIII

 Finally, Defendant claims there was insufficiency of evidence to be found guilty of murder and conspiracy to commit murder beyond a reasonable doubt. On such an issue we neither weigh the evidence nor judge the credibility of witnesses. We determine only whether there is sufficient evidence of probative value from which the fact finder could make its findings beyond a reasonable doubt. If there is evidence of probative value to support the conclusion of the jury in the trial court, the conviction will not be overturned. *Napier v. State,* (1983) Ind., 445 N.E.2d 1361, *reh. denied; Williams v. State,* (1982) Ind., 433 N.E.2d 769; *Hubbard v. State,* (1982) Ind., 437 N.E.2d 52. The only interpretation that can be given Defendant's argument on this issue is that he asks us to reweigh the evidence and the credibility of the witnesses. This, of course, we will not do. There was more than sufficient evidence to justify the jury in finding the defendant guilty of both charges beyond a reasonable doubt. We have already set out the facts showing that the defendants knew there were police officers outside demanding entry and, in fact, some strong inferences that they knew it was Sgt. Ohrberg. When the police tried to enter, they found the door blocked with a piece of heavy furniture and when Ohrbert attempted to force the door and enter he was shot from two different points in the room. There was further evidence that Earl Resnover and two women who were in the residence were locked in another room or at least were confined there because the door was stuck. The evidence indicated that Smith and Gregory Resnover were the two firing from the room at Ohrberg. One of the bullets fired by Ohrberg struck Smith and he was found in that position after the

firing ceased. At least one of the bullets found in Sgt. Ohrberg's body came from an AR–15 rifle that was found near the position of Tommie Smith in the room. An autopsy revealed that Ohrberg had been hit at least three times and that the cause of his death was multiple gunshot wounds. There is, therefore, no merit to Smith's contention that there is a lack of evidence that he was the "triggerman" who killed Ohrberg. Gregory Resnover, in his appeal, *Resnover*, 460 N.E.2d at 934 (Issue VIII), raised the same question Smith raises, that there is no proof that he was the "triggerman", and cites us to United States Supreme Court case of *Enmund v. Florida*, (1982) 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140. As we pointed out in *Resnover, supra*, defendant Enmund was a getaway car driver whose confederates robbed and killed an elderly farm couple. Defendant Enmund apparently never left the car and therefore was not present when the victims were actually confronted or when the plan to rob the elderly couple led to their being murdered. The Supreme Court held that since the record did not show that the defendant intended to participate in or facilitate a murder, his culpability for the murder perpetrated by his confederates was different than that of his confederates. In this case the jury could have found that defendant Smith was, in fact, the trigger man or one of the trigger men who directly caused Ohrberg's death as both Smith and Gregory Resnover were firing at Ohrberg at the time he fell. After Ohrberg fell, a person who appeared to be Gregory Resnover stepped out on the porch and fired two more shots into Ohrberg's body. Later, when Gregory Resnover surrendered, he carried out an AR–15 rifle but shots from that rifle were not the ones that killed Sgt. Ohrberg. The gun that killed Sgt. Ohrberg was lying in the room near Tommie Smith and also near the position occupied by Gregory Resnover during the shooting. Tommie Smith's position then is not different than Resnover's in that it cannot be said that either of them neither took a life, attempted to take a life, nor intended to take a life. Unlike *Enmund, supra*, De-fendant's criminal culpability was equal to that of Resnover's as one or both of them caused Ohrberg's death and Smith clearly fired on Detective Ohrberg with every intention of taking his life. Under these circumstances there need be no actual proof as to which of these participants actually caused the death of Sgt. Ohrberg. Smith is equally guilty with Resnover and the jury was therefore justified in finding that he was either the trigger man or one of the trigger men who directly caused Ohrberg's death. Defendant Smith therefore presents no showing of reversible error on this issue.

Having considered all of the issues raised by Defendant and finding no error, we now examine whether the death sentence imposed by the court is appropriate in Defendant's case. The trial judge made detailed and written findings pursuant to Ind.Code § 35–50–2–9 (Burns Supp.1984) to facilitate our review. The trial judge found that the State had proven beyond a reasonable doubt the aggravating circumstance that the victim of this murder was a law enforcement officer acting in the course of his duty. He then indicated it was his duty to determine any mitigating circumstance in the case. He then specifically considered each mitigating circumstance set out in the above statute. He indicated he was doing this from reviewing all the evidence in the case, the arguments of counsel, the law as presented to him by counsel, and the pre-sentence investigation as submitted to the court by the probation department. He found that Defendant had a significant history of prior criminal conduct and detailed these involvements in his findings, concluding that mitigation was not proven in that regard. He found there was no evidence of mitigating circumstance with regard to the question of whether defendant Smith might have been under the influence of extreme mental or emotional disturbance when he committed this murder by finding that there was no evidence in the record whatsoever that Defendant was, in fact, under any mental or emotional disturbance at the time of the

**1126**

crime. He further found beyond a reasonable doubt that there was no indication whatsoever that the victim in this case participated in or consented to Smith's conduct against him. He further considered the mitigating circumstance of whether or not the murder was committed by another person and the participation of this defendant was relatively minor. The judge then found that by the words of the defendant himself, he indicated that his participation was direct. He further found that he searched the record to determine whether or not defendant Smith had acted under the substantial domination of another person and found beyond a reasonable doubt that there was no such domination by anyone else but that this was a conscious act by defendant Smith that he chose. He then directly found that there was no evidence to indicate that the defendant did not appreciate the criminality of his conduct or conform his conduct to the requirements of law because of being substantially impaired by mental disease or defect or intoxication. He found there were no facts whatsoever presented to indicate this. The trial judge therefore found that there were no mitigating circumstances.

The trial judge then found that the felony committed by defendant Smith resulted in the death of Sgt. Ohrberg and involved the threat of death and great bodily harm to other people. He found that Defendant knowingly directed gunfire toward Sgt. Ohrberg while he was in the performance of his duties as a police officer. He found this conduct caused and threatened to cause serious bodily harm to other people. He then found from considering all the circumstances in the case that Defendant contemplated this act by the knowing use and collection of especially deadly weapons. He found there was no provocation whatsoever for Defendant's acts and no grounds existed that he could find in the cause to excuse the conduct intentionally engaged in by Defendant on the night of the murder. The judge then found that Defendant played a major role in the commission of this offense and that he made no good faith effort whatsoever to compensate or explain his actions to the victim in this case. He further found that the age of the defendant was not a factor in the case. The trial judge then concluded that the proper sentence for Smith was death by electrocution.

The record supports all of the findings by the trial judge and does show that Defendant took a direct and substantial part in all of the incidents involving the shooting at police officers which resulted in Sgt. Jack Ohrberg's death. The record clearly shows that Smith knowingly and intentionally participated in this criminal activity knowing that Sgt. Ohrberg was acting in an official capacity as a police officer and causing the death of Sgt. Ohrberg while he was serving in an official capacity as a police officer. We therefore find and now hold that the death penalty as provided for by our statutes was not arbitrarily or capriciously imposed upon defendant Smith and is reasonable and appropriate in his case.

The trial court is affirmed in all things, including its imposition of the death penalty upon defendant Smith. This cause is accordingly remanded to the trial court for the sole purpose of setting the date when Defendant's death sentence is to be carried out.

GIVAN, C.J., and DeBRULER, HUNTER and PRENTICE, JJ., concur.